Filed 5/28/15  P. v. Nava CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ERNESTO NAVA,<br><br>    Defendant and Appellant. | B255719<br><br>(Los Angeles County<br>Super. Ct. No. PA076141) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed; remanded for resentencing.

Orly Ahrony, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Idan Ivri, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant was convicted of one count of assault with a firearm (Pen. Code, § 245, subd. (a)),[1] one count of criminal threats (§ 422, subd. (a)), one count of second degree robbery (§ 211), one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)), and one count of possession of ammunition (§ 30305, subd. (a)(1)). The jury found true the allegation that defendant personally used a firearm to commit the assault, robbery, and criminal threat counts (§ 12022.5, subds. (a), (d)).

On appeal, defendant contends (1) admission of a 911 call transcript violated his Confrontation Clause rights; (2) insufficient evidence supports his convictions for assault with a deadly weapon and criminal threats; and (3) the trial court improperly imposed the five-year sentence enhancement under section 667, subdivision (a)(1) to more than one determinate term. We affirm defendant's convictions, and remand for sentencing on counts 3, 4, and 5.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant was charged in an information with one count of assault with a firearm (§ 245, subd. (a); count 3), one count of criminal threats (§ 422, subd. (a); count 4), one count of second degree robbery (§ 211; count 5), one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 6), and one count of possession of ammunition (§ 30305, subd. (a)(1); count 7). The information further alleged as to counts 3, 4 and 5 that defendant personally used a firearm (§ 12022.5, subds. (a), (d)), as to counts 4 and 5 that defendant personally used a firearm (12022.53, subd. (b)), that defendant had one prior felony conviction pursuant to section 667, subd. (a)(1), one prior strike conviction pursuant to section 667, subdivisions (a)–(i) and section 1170.12, subdivisions (a)–(d).[2]

On February 23, 2013, at 7:28 p.m., 911 dispatch received a phone call from "Olivia," who stated that defendant, her son, had gotten mad, taken the keys to her truck, and driven off with his young daughter. Olivia reported that defendant was drunk.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Counts 1 and 2, which related to a 911 call defendant's mother made as discussed below, were dismissed at the preliminary hearing.

Defendant had a gun. The 911 operator told Olivia to hold on, and that she would be sending over an officer to Olivia's address at 15403 Sherman Way. The car defendant was driving was a black Yukon.[3] A redacted tape of the 911 call was played for the jury.

Counts 3 and 4. On February 23, 2013, at approximately 7:30 p.m., Carlos Garcia was working in the area of defendant's mother's apartment complex on Sherman Way, as a Pizza Hut delivery person. He was wearing a Pizza Hut hat. He stopped at an apartment complex and was unable to get in until a girl between six and eight years opened the gate. She was with defendant. Defendant attempted to grab the pizza from Garcia. Defendant pointed a gun at Garcia and stated he was going to kill him. Defendant fired the gun, but nothing happened. Defendant hit Garcia on the head with the gun. Garcia bent down and tried to run, and was able to run between some cars. After about five minutes, defendant left in a black truck that might have been a Tahoe or a Yukon. Garcia went back to his employer's location, and the police were called. Garcia spoke to four or six policemen, and provided a description of a male Hispanic between 20 to 30 years old. Sometime later, Garcia identified defendant, who was in custody, at an interview and identified him at the preliminary hearing, but Garcia did not identify defendant at trial. Garcia did not attend a lineup, nor was he shown a photo array.

Counts 5 and 6. On February 23, 2013, Carlos Ibarra worked for Domino's Pizza as a delivery driver. About 7:50 p.m., he made a delivery at Glenoaks Boulevard near Van Nuys Boulevard. Ibarra was in the parking lot of the apartment complex when defendant, who had been standing near a truck, approached him. Defendant was wearing a gray hoodie. Defendant said something to Ibarra, who did not hear him, and defendant pulled out a gun and said, "What? You heard." Defendant told Ibarra to put the pizza on the trunk of Ibarra's car, and told him to put the money with the pizza. Ibarra had $30 on him. Defendant took everything and walked away. Ibarra called his employer, who

---

[3] The trial court redacted the 911 call to omit Olivia's statement that defendant had fired the gun and/or shot it in the air.

called 911. Ibarra provided a description of a male Hispanic in a gray hoodie, and identified defendant in court. Ibarra also identified the gun used during the robbery.

Officer Casey Szabo of the Los Angeles Police Department was investigating the Ibarra robbery and received a description of a suspect who was a male Hispanic wearing a gray hooded sweatshirt and khaki pants. Officer Szabo and some other units set up a surveillance at the scene of the crime on Glenoaks. They saw a black GMC Yukon driven by a male Hispanic wearing a grey hooded sweatshirt leave the apartment complex. Officer Szabo conducted a traffic stop of the car. Defendant, his friends Luis Alberto Pimentel Ponce and Ramon Ramirez were in the vehicle. Officer Szabo observed a magazine of live ammunition in the center console between the driver seat and passenger seat. In the rear cargo area of the vehicle, they found an operable handgun. The Yukon also contained pizza boxes and receipts from Domino's.

Ponce was a friend of Ramon Ramirez and defendant. On February 23, 2013, he met up with them between 7:00 p.m. and 8:00 p.m. at Ramirez's apartment. They left to go to the store in defendant's Chevrolet GMC and they were pulled over by police. Defendant threw a gun in the back of the car. Officer Gerardo Mejia of the Los Angeles Police Department was investigating the Ibarra robbery. He interviewed Ramirez, who told him that defendant had arrived at his house with several pizzas. They ate the pizzas. They left to go to a friend's house when they were stopped by police.

The defense rested based upon the prosecution's case.

The jury found defendant guilty on all counts. Defendant admitted having suffered a prior conviction that qualified as a strike. The trial court sentenced defendant to an aggregate term of 32 years, consisting of:

(1) Twenty-one years on count 5 (the middle term of three years, doubled pursuant to the "Three Strikes" law), plus 10 years for the firearm use enhancement, plus five years for the section 667, subdivision (a)(1) enhancement;

(2) Eight years and four months on count 3, consisting of one year (one third of the middle term), doubled pursuant to the Three Strikes law, plus an additional 16 months

for the firearm enhancement, plus an additional five years for the section 667, subdivision (a)(1) enhancement;

(3) Two years and eight months on count 4, consisting of one third the middle term, doubled to one year and four months pursuant to the firearm enhancement, with the section 667, subdivision (a)(1) enhancement stayed; and

(4) The middle term of two years, stayed pursuant to section 654, on counts 6 and 7.

## DISCUSSION

### I. Admission of Tape of Defendant's Mother's Call to 911

Defendant argues the trial court erred in admitting the transcript of Olivia's 911 call because it was inadmissible under the Confrontation Clause because the statements were testimonial. Further, the call did not constitute an excited utterance because it occurred half an hour after the events in question, and there was no ongoing emergency. Finally, Olivia's statements are testimonial because they were made in response to direct questions from the 911 operator and consisted of descriptions of past events.

#### A. *Factual Background*

Before trial, the prosecution sought admission of defendant's mother's call to 911 shortly before defendant began his crime spree. The prosecution argued that the call could come in under the hearsay exception for excited utterance and that Olivia's statements were nontestimonial. Defendant objected, contending there was no foundation the caller was in fact his mother, the caller was unavailable and not subject to cross-examination, and did not testify at the preliminary hearing. The trial court admitted the transcript over defendant's objection.

#### B. *Discussion*

In *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*), the United States Supreme Court held the Sixth Amendment bars the admission of out-of-court testimonial statements except when both the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness.

5

(*Id.* at pp. 59, 68.) *Crawford* did not set forth "a comprehensive definition" of testimonial evidence but held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id.* at p. 68.) *Crawford* held that where the proffered statement is nontestimonial, state law may regulate the admission of evidence by applying statutory hearsay rules without running afoul of the confrontation clause. (*Ibid*.)

1.    OLIVIA'S STATEMENTS IN THE 911 CALL WERE NOT TESTIMONIAL

In *Davis v. Washington* (2006) 547 U.S. 813 [126 S.Ct. 2266, 165 L.Ed.2d 224] (*Davis*), the United States Supreme Court addressed the circumstances under which "statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirements of the Sixth Amendment's Confrontation Clause." (*Id.* at p. 817.) *Davis* addressed two cases with different factual situations. In one case, a domestic disturbance victim called 911 and described the perpetrator's actions to the operator as she was being assaulted. In response to the operator's specific questions, the victim reported the perpetrator's name, described how he was attacking her, and identified her location. The victim started to ramble and the 911 operator admonished her to "'[s]top talking and answer [her] questions.'" (*Id.* at pp. 817–818.) As the call progressed, the victim said the perpetrator had just run out the door and was leaving in a car. At trial, the victim did not appear and the prosecution introduced the tape recording of the 911 call. (*Id.* at pp. 818–819.) *Davis* also addressed the facts of a companion case in which officers arrived at the home of a domestic violence victim shortly after she had been assaulted. The perpetrator was still at the house and tried to interfere as the victim spoke to the officers. The officers interviewed the victim separately about the incident, and she signed a written battery affidavit about how the perpetrator attacked her. The victim refused to appear at trial, and the prosecution introduced the testimony of the officers who interviewed her. (*Id.* at pp. 819–821.)

6

*Davis*, *supra*, 547 U.S. 813 offered the following definition of testimonial statements under *Crawford*, *supra*, 541 U.S. 36 and the Sixth Amendment: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis*, at p. 822.) Relying on this definition, *Davis* held that in the first case the victim's statements to the 911 operator were admissible and not testimonial under *Crawford*. The initial interrogation conducted in connection with a 911 call "is ordinarily not designed primarily to 'establis [h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Davis*, at p. 827.) The victim who called 911 was "speaking about events *as they were actually happening*, rather than 'describ[ing] past events,' [citation]." (*Ibid.*) The victim "was facing an ongoing emergency," and her 911 call "was plainly a call for help against a bona fide physical threat." (*Ibid.*) Moreover, the questions posed by the 911 operator did not turn the victim's statements into testimonial evidence because "the nature of what was asked and answered . . . again viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn . . . what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [Citation.]" (*Ibid.*) The victim's "frantic answers" were provided "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Ibid.*)

*Davis*, *supra*, 547 U.S. 813 thus concluded the circumstances of the 911 operator's "interrogation" of the victim "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. [The victim] simply was not acting as a witness; she was not testifying. What she said was not 'a weaker substitute for live

7

testimony' at trial. . . . No 'witness' goes into court to proclaim an emergency and seek help." (*Id*. at p. 828.) *Davis* also held, however, that once the 911 operator "gained the information needed to address the exigency of the moment, the emergency appears to have ended (when [the perpetrator] drove away from the premises)." (*Ibid*.) At that point, the victim's statements became testimonial and the 911 operator's questions were "not unlike the 'structured police questioning'" that was found testimonial in *Crawford*, *supra*, 541 U.S. 36. (*Davis*, at pp. 828–829.)

In contrast, *Davis*, *supra*, 547 U.S. 813 held the victim's statements to the police officers in the companion case were testimonial and inadmissible in the absence of the victim's trial testimony. The victim told the officers that things were fine. Her statements were given through a written affidavit, as part of an investigation into possible past criminal conduct, and there was no emergency or immediate threat to the victim. (*Id*. at pp. 819–821, 827, 829–830.) The officers did not ask questions to determine "'what [was] happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime— which is, of course, precisely what the officer *should* have done." (*Id*. at p. 830.)

In *People v. Brenn* (2007) 152 Cal.App.4th 166 (*Brenn*), the defendant and the victim lived at a group home and got into a fight over the defendant's girlfriend. The defendant grabbed a knife and stabbed the victim in the stomach. The victim left the group home, went to another location, called 911, and reported the stabbing. The 911 operator asked the victim who had stabbed him and how it had happened. The victim identified the defendant, explained they were fighting about the defendant's girlfriend, and described the fight in detail. The operator asked the victim several questions about the defendant's location, whether the defendant had mental health problems, and if he still had a knife. The victim answered to the best of his knowledge. (*Id*. at pp. 170–171.) *Brenn* held the victim's statements to the 911 operator were not testimonial under *Crawford*, *supra*, 541 U.S. 36 and *Davis*, *supra*, 547 U.S. 813 because "the purpose and form of the statements were not the functional equivalents of trial testimony." (*Brenn*,

8

*supra*, 152 Cal.App.4th at p. 176.) *Brenn* further held there was no material difference between the victim's statements to the 911 operator about the stabbing and the 911 call in *Davis*. (*Brenn*, at p. 177.) *Brenn* held the victim's statements about the stabbing were made "in response to rapid-fire questioning from the dispatcher. There was nothing formal, solemn or structured about the colloquy. And unlike a criminal prosecutor, the dispatcher was primarily concerned with what was happening at the moment, as opposed to what had happened in the past. The dispatcher was eliciting information in an attempt to assess the present situation and help [the victim] and the responding officers, not secure a conviction in a court of law." (*Id*. at pp. 176–177.) *Brenn* discounted the fact that the victim told the 911 operator he wanted to press charges against the defendant: "[I]t does not appear that his *primary purpose* during the call was to establish past facts for use in a criminal trial, or that the 911 operator was concerned about that issue. . . .' [T]he proper focus is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial.' [Citation.]" (*Id.* at p. 177.)

     *Brenn*, *supra*, 152 Cal.App.4th 166 also rejected the defendant's argument that the victim no longer was facing an emergency as he spoke to the 911 operator about the stabbing and noted such a claim was "much easier to make from a law office than from 100 feet from someone who has just stabbed you." (*Id*. at p. 177.) The victim was suffering a stab wound and defendant was still at large. "It is hard to construct a definition of the word 'emergency' that this scenario does not fit." (*Ibid*.) The victim's information was important to help the police "formulate an appropriate response to the situation. It does not appear the information was elicited or provided for the primary purpose of making a case against [defendant] at trial." (*Ibid*.)

     In *People v. Banos* (2009) 178 Cal.App.4th 483, the court addressed the admissibility of several out-of-court statements made by a domestic violence victim who

9

later was murdered by the defendant. In March 2004, the victim called 911 and, in response to the dispatcher's questions, identified herself and said she had a restraining order against the defendant and that he was at her apartment and she was afraid he was going to attack her. The victim explained she was calling from a phone booth because he was dangerous, he had been arrested a few months earlier for attempted murder, and he was not supposed to be near her. (*Id*. at pp. 488, 492.)

*People v. Banos*, *supra*, 178 Cal.App.4th 483 held the victim's statements to the 911 operator in March 2004 were not testimonial under *Davis*, *supra*, 547 U.S. 813 and *Crawford*, *supra*, 541 U.S. 36. (*Banos*, at pp. 492–493, 497.) The victim's "primary purpose for making the statements to the 911 dispatch officer was to gain police protection. The statements were not yet the product of an interrogation, rather, they were made to police conducting an investigation into an ongoing emergency." (*Id*. at p. 497; see *People v. Byron* (2009) 170 Cal.App.4th 657, 661–662, 675 [victim's statements about defendant's assault on her, in response to questions posed by 911 operator, were not testimonial under *Davis* and *Crawford*].)

Here, Olivia's statements to the 911 operator were not testimonial under *Crawford*, *supra*, 541 U.S. 36. Her statements were made in response to the 911 operator's questions and involved an ongoing, potentially dangerous situation. Olivia was concerned that defendant be located before he hurt anyone, as he was armed, angry, and intoxicated, and driving a truck. Thus, to the extent that defendant argues Olivia's statements were testimonial because no harm to her was imminent, this is contention is without merit. Further, simply because Olivia calmly answered the questions the 911 operator asked her, or her statements were vague, does not transmute her responses into testimonial statements. The operator was concerned that defendant might return and told Olivia to wait until police arrived, indicating the events were ongoing and yet unfolding.

As in *Davis*, *supra*, 547 U.S. 813, which held that a 911 call "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Id*. at p. 827.) *Davis* held the victim's call in

10

that case "was plainly a call for help against a bona fide physical threat." (*Ibid.*)

Moreover, the questions posed by the 911 operator in *Davis* did not turn the victim's statements into testimonial evidence because "the nature of what was asked and answered . . . again viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn . . . what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [Citation.]" (*Ibid.*)

2.     THE STATEMENTS WERE EXCITED UTTERANCES

Further, the statements constitute excited utterances because Olivia was under the stress of the situation when she called 911. Even if an out-of-court statement is not testimonial under *Crawford*, *supra*, 541 U.S. 36, the statement still must be admissible under applicable state evidentiary rules, including hearsay rules. (*Id.* at p. 68; *People v. Cervantes* (2004) 118 Cal.App.4th 162, 173; *People v. Banos*, *supra*, 178 Cal.App.4th at p. 494, fn. 3.) Evidence Code section 1240 states the excited utterance or spontaneous declaration exception to the hearsay rule: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." "The hearsay exception for spontaneous declarations is among those 'firmly rooted' exceptions that carry sufficient indicia of reliability to satisfy the Sixth Amendment's confrontation clause. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 529.) The court's ultimate decision to admit the evidence is reviewed for an abuse of discretion. (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)

In *People v. Gutierrez* (2000) 78 Cal.App.4th 170, the court explained the requirements that must be met in order for the excited utterance exception to apply to hearsay evidence, such as the contents of a 911 call. First, there must have been an occurrence startling enough to produce nervous excitement and unreflecting statements.

11

Second, the statements must have been made before there was time to contrive and misrepresent. Finally, the statements must have related to the circumstances of the occurrence that preceded them. (*Id*. at p. 177; see *People v. Farmer* (1989) 47 Cal.3d 888, 901.)

Here, Olivia called 911 because her son was angry, drunk, had a gun, and had left in her car with a small child. She did not know where he had gone. Her statements were made roughly contemporaneous with events that were unfolding, not later when she would have had an opportunity to reflect or contrive,[4] and only those statements that pertained to the incident were admitted into evidence. Under these facts, we conclude the trial court did not abuse its discretion in admitting the redacted 911 call pursuant to Evidence Code section 1240. (*People v. Phillips*, *supra*, 22 Cal.4th at p. 236.)

## II. Sufficient Evidence Supports Defendant's Convictions on Counts 3 and 4

Defendant argues no reasonable trier of fact could have found he committed the crimes charged in counts 3 and 4 against Carlos Garcia because although Garcia identified defendant while defendant was in custody (not from a six-pack or in a lineup), Garcia was adamant at trial that defendant was not the person who robbed him.

On review of a claim of insufficient evidence, we ask "whether '"after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.) The evidence upon which the judgment relies must be "reasonable, credible, and of solid value." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) It is not our role to reweigh evidence or evaluate the credibility of the witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Section 245, subdivision (a)(1) proscribes assault with a firearm. The mental element for the assault charge is that "assault does not require a specific intent to cause

---

[4] Defendant refers to the 911 call log for the proposition that the call came in one-half hour after defendant left. Olivia tells the 911 operator that she had come inside and did not know if defendant was still outside or not: "I don't know if he's gone or not, but he got us out of the—we came in[side], and he stayed outside."

12

injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790.)

Section 422 describes a criminal threat as the act of "threaten[ing] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety."

Here, defendant's sufficiency argument is based upon identity due to Garcia's failure to identify him at trial, rather than commission of all of the elements of the crimes. We find these contentions without merit, and that there is sufficient evidence defendant was the perpetrator. The man who assaulted and threatened Garcia was driving what appeared to be a black Yukon or Tahoe, as described by Garcia; a Yukon was the kind of car defendant drove; the assault occurred at defendant's mother's apartment building around the time she said that defendant had left with a gun in an angry mood. Garcia identified defendant shortly after the commission of the crimes, and at the preliminary hearing.

## III. Sentencing Error

Defendant argues the trial court improperly imposed the five-year serious felony enhancement for each assault with a deadly weapon and criminal threat count, although determinate sentencing law permits a five-year serious felony enhancement to be imposed only once because it is an offender-based enhancement, relying on *People v. Tassell* (1984) 36 Cal.3d 77, 90.

13

In *People v. Sasser* (2015) 61 Cal.4th 1, the Supreme Court held when a defendant's strike sentence includes multiple terms for several offenses, the prior serious felony enhancement under section 667, subdivision (a)(1) may be applied only once to multiple determinate terms. (*Sasser*, at p. 6.) Defendant is therefore correct that the trial court improperly applied the section 667, subdivision (a)(1) enhancement more than once, and remand the matter for resentencing in light of *Sasser*, at page 7.

## DISPOSITION

Ernesto Nava's conviction is affirmed. His sentence on counts 3, 4 and 5 is vacated and the matter is remanded for resentencing, with Penal Code section 667, subdivision (a)(1) enhancement applied to only one count of conviction. The superior court is directed to prepare an amended abstract of judgment reflecting these modifications and to forward a copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.

14